UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | No. 3:13-00209 |
| | ) | JUDGE CAMPBELL |
| JUAN COLLAZO | ) | |

MEMORANDUM AND ORDER

I. Introduction

Pending before the Court is Defendant Juan Collazo's Motion To Suppress Evidence (Docket No. 53). The Court held an evidentiary hearing on the Motion on June 18 and 19, 2014. The parties have filed post-hearing briefs. (Docket Nos. 109, 110). For the reasons stated herein, the Motion To Suppress (Docket No. 48) is GRANTED in part, and DENIED in part.[1]

II. Factual and Procedural Background

Through his Motion To Suppress, the Defendant makes the following claims: (1) the initial traffic stop was unlawful; (2) the stop was unlawfully prolonged; (3) the search of his vehicle was unlawful; (4) the search of his cell phone was unlawful; and (5) officers violated his Miranda rights.

III. Analysis

A. Initial Traffic Stop

The Defendant first argues that the initial stop of his vehicle violates the Fourth Amendment. The Government argues that the stop was supported by probable cause to believe the Defendant committed the civil traffic violation set forth in Tennessee Code Annotated

---

[1] The Court dismissed the Defendant's selective prosecution claim at the conclusion of the hearing. (Docket No. 99).

Section 55-8-124(a) of following the vehicle in front of him too closely.

Stopping and detaining a motorist constitutes a "seizure" under the Fourth Amendment. See, e.g., United States v. Cochrane, 702 F.3d 334, 340 (6th Cir. 2012). The Sixth Circuit has held that an officer may lawfully stop a vehicle when he or she either has probable cause to believe that a civil traffic violation has occurred or reasonable suspicion of an ongoing crime. United States v. Jackson, 682 F.3d 448, 453 (6th Cir. 2012); United States v. Smith, 601 F.3d 530, 542 (6th Cir. 2010). If probable cause exists for the traffic stop, the officer's subjective motivation for making the stop is not relevant. Whren v. United States, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed. 89 (1996).

"Probable cause" is a reasonable ground for belief supported by less than prima facie proof but more than mere suspicion. See, e.g., United States v. Alexander, 528 Fed. Appx. 515, 518 (6th Cir. June 11, 2013). Probable cause determinations are "fact-dependent and will turn on what the officer knew at the time he made the stop." United States v. Valdez, 147 Fed. Appx. 591, 594 (6th Cir. Sept. 26, 2005).

Tennessee Code Annotated Section 55-8-124(a) provides: "The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the vehicles and the traffic upon and the condition of the highway." The Sixth Circuit has specifically held that an officer does not violate the Fourth Amendment when he or she stops a vehicle based upon probable cause to believe a violation of this statute has occurred. See United States v. Kelley, 459 Fed. Appx 527, 532 (6th Cir. Feb. 7, 2012)(Officer's testimony that he saw the defendant's vehicle, traveling about 55 miles-per-hour, within three to five feet of vehicle in front of it supported a finding of probable cause for the stop); United States v.

2

Sanford, 476 F.3d 391, 395-96 (6th Cir. 2007)(Officer who observed defendants' vehicle momentarily follow another vehicle within a distance of 10 feet while traveling 65 miles-per-hour and a third vehicle passing in the passing lane had probable cause to believe Tenn. Code Ann. § 55-8-124(a) had been violated, and was justified in making the stop); Valdez, supra (Officer who observed vehicle traveling approximately 60 miles per hour pull to within 20 to 30 feet of another vehicle is justified in making a stop for violation of Tenn. Code Ann. § 55-8-124(a)); United States v. Jimenez, 446 Fed. Appx 771 (6th Cir. Nov. 30, 2011)(Probable cause to believe statute violated where officer testified that he saw defendant's vehicle, traveling at a speed of 55 miles-per-hour, come within 24 inches of the vehicle in front of it).

At the hearing, Preston Hill, a deputy for the Haywood County Sheriff's Department and a special agent with the West Tennessee Drug Task Force, testified that on October 9, 2013,[2] he was on duty in the median of the eastbound side of Interstate 40 around mile marker 46 when he observed the Defendant's vehicle. (Transcript of Suppression Hearing, Volume I, at 8-13 (Docket No. 104)). Deputy Hill testified that the Defendant's vehicle was following a tractor-trailer truck and was traveling with surrounding vehicles at a speed of approximately 70 miles per hour. (Id., at 13, 21). After observing the Defendant's vehicle for a short period of time, Deputy Hill determined that the Defendant was traveling too closely behind the tractor-trailer truck. (Id., at 13, 21-25). Deputy Hill testified that as he neared the Defendant's vehicle, the Defendant began to decelerate and increase the distance between his vehicle and the truck. (Id., at 22-23).

---

[2] Early in his testimony, Deputy Hill stated that the incident occurred on October 8, 2013. The parties later stipulated that the correct date was October 9, 2013. (Transcript of Suppression Hearing, Volume I, at 8, 62-63 (Docket No. 104)).

3

Deputy Hill testified that in making the determination that the Defendant was following too closely, he applied a rule of thumb that a vehicle should allow one car length for every 10 miles per hour that it is traveling. (Id., at 20). Thus, according to Deputy Hill, a vehicle traveling 60 miles per hour is likely following too closely if it is closer than six car lengths behind the vehicle in front of it. (Id.).

Upon determining that the Defendant's vehicle did not allow such a safe distance between it and the truck in front of it, Deputy Hill eventually pulled behind the Defendant and activated his blue lights. (Id., at 25). The Defendant then stopped his vehicle in the break-down lane and Deputy Hill pulled behind him. (Id.)

Deputy Hill testified that his car has a camera that is activated when he turns on his lights, and begins recording 30 seconds or so prior to that point. (Id., at 14-19). According to Deputy Hill, the audio capability for the camera was not working on the date in question. (Id.). The video of the stop, filed at Docket No. 92, was played multiple times during the evidentiary hearing.

The Defendant testified at the hearing that the stop occurred as he was traveling on Interstate 40 heading to Nashville. (Transcript of Suppression Hearing, Volume II, at 253-54 (Docket No. 105). After passing mile marker 42, the Defendant testified, he noticed a white Tahoe on an access road between mile markers 43 and 43. (Id., at 254). The Defendant testified that after seeing that an officer was in the vehicle, he slowed down to 68 miles per hour. (Id., at 255). According to the Defendant, he then noticed another officer had pulled a vehicle over in the break-down lane, and he moved into the left lane of traffic with the other vehicles that were in the left lane. (Id., at 255-56). When he changed lanes, the Defendant testified, he slowed down

4

to 55 miles per hour, and maintained that same speed as he began to return to the right lane. (Id., at 256). At that point, according to the Defendant, the white Tahoe pulled almost to the side of his vehicle, then moved into the lane behind him and pulled him over. (Id., at 256-57). The Defendant testified that he was not following too closely behind the tractor-trailer truck in front of him. (Id., at 275).

The Tennessee Comprehensive Driver License Manual, introduced as Government's Exhibit 1 at the hearing, provides as follows:

> The Two-Second Rule
>
> To share the road safely, stay a safe distance from the vehicle in front of you. Nationally safety agencies and driver education programs have tried to define a safe following distance for drivers to maintain. This has ranged from a two to four second following distance. Use the following tips to determine if you are following too closely:
>
> [Graphic]
>
> A. As the car ahead of you passes a stationary point on the road (a sign post, driveway, utility pole, etc.), count the seconds it takes you to reach the same spot.
> . . .
>
> B. Count to yourself "one-thousand and one, one-thousand and two," etc. You should NOT reach the same point on the road before you finish counting to at least "one-thousand-two." If you do, you are following too closely.
>
> C. Slow down slightly to increase the space between you and the other vehicle. Find another spot to check your new following distance. Repeat this exercise until you are following no closer than two seconds.
>
> This principle will hold true at any speed on state and U.S. highways with moderate speed limits. However, during inclement weather, *interstate highway driving at higher speeds* and night driving, the two-second rule should be increased to allow for improved visibility. *A minimum of four seconds should allow for better reaction time and a safer space cushion under these conditions* including following a motorcycle.

(Government's Exhibit 1, at 48-49)(italicized emphasis added).

5

The Manual also estimates that the braking distance for a vehicle traveling 70 miles per hour is 290 feet, and when the "perception time" is included, the total stopping distance is 418 feet. (Id., at 49). The Manual estimates the average stopping distance, excluding the distance required for "perception time," is 367 feet. (Id.) See also Valdez, 147 Fed. Appx at 594 (Applying standard in previous version of driver manual that vehicles should maintain at least one car length for every 10 miles per hour); Stanford, 476 F.3d at 396 (applying same standard).

At the hearing, the Defendant referred to a document indicating that Federal Highway Safety Administration requires the white lines painted in the center of roadways to be 10 feet long, and the gap between the lines to be 30 feet long. (Transcript of Suppression Hearing, Volume II, at 195-97 (Docket No. 105)). Using that measure of distance, the Defendant argues, shows that the Defendant was not following too closely.

Having viewed and considered the video (Docket No. 92) and the other exhibits admitted at the hearing, including the recommendations contained in the Driver License Manual, as well as having observed the demeanor of the witnesses, the Court is persuaded that Deputy Hill had probable cause to believe the Defendant's vehicle violated Tennessee Code Annotated Section 55-8-124(a) when he made the stop. The video supports Deputy Hill's testimony that the Defendant's vehicle followed the tractor-trailer truck "more closely than is reasonable and prudent" at the time Deputy Hill first observed it. Although the Defendant vehemently contends that he was not following too closely, the "relevant inquiry is whether the police officer possessed probable cause. . . to believe that a traffic violation occurred, not whether a traffic violation in fact occurred," or whether the violation has been proved beyond a reasonable doubt.

Sanford, 476 F.3d at 396 n. 2.[3]

B. Duration of the Stop and Search of the Vehicle

The Defendant also argues that the traffic stop was unconstitutionally prolonged by the officers. The Government argues that duration of the stop was lawful.

The Supreme Court has held that "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." Illinois v. Caballes, 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005). "A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." Id.

On the other hand, "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop. . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." Arizona v. Johnson, 555 U.S. 323, 333, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009). A "measurable extension" is more than "minimal." United States v. Stepp, 680 F.3d 651, 662 (6th Cir. 2012); United States v. Everett, 601 F.3d 484, 492 (6th Cir. 2010). In determining whether the extension of the stop violates the Fourth Amendment, the Sixth Circuit has held that "the proper inquiry is whether the 'totality of the circumstances surrounding the stop' indicates that the duration of *the stop as a whole* – including any prolongation due to suspicionless unrelated questioning – was reasonable." United States v. Everett, 601 F.3d at 494 (quoting United States v. Turvin, 517 F.3d

---

[3] In reaching this conclusion, however, the Court does not rely on the opinion testimony offered by Trooper Montgomery regarding the initial stop.

1097, 1101 (9th Cir. 2008))(emphasis in original)).

In determining reasonableness, courts are to examine whether the police diligently pursued a means of investigation to determine whether the suspected traffic violation occurred, and if necessary, issue a ticket. Id. Police diligence involves requesting a driver's license and vehicle registration, running a computer check, and issuing a ticket. Cochrane, 702 F.3d at 341 (citing United States v. Digiovanni, 650 F.3d 498, 507 (4th Cir. 2011)). "Locomotion-related inquiries not strictly directed to the motorist's conduct at the time of the stop, such as '[the] motorist's travel history and travel plans' and 'the driver's authority to operate the vehicle,' . . . rarely suggest a lack of diligence." Id. See also United States v. Crawley, 526 Fed. Appx. 551, 556-57 (6th Cir. May 15, 2013)(Not unreasonable for officer to ask about travel plans before issuing traffic citation); United States v. Smith, 601 F.3d at 542 (Questions about travel plans, outstanding warrants, and identification were appropriate and did not unreasonably extend traffic stop). In addition, questions directed toward officer safety, such as inquiries about dangerous weapons, do not suggest a lack of diligence. Id., at 495.

A lack of diligence is shown, however, "if the totality of the circumstances, viewed objectively, establishes that the officer, without reasonable suspicion, definitely abandoned the prosecution of the traffic stop and embarked on another sustained course of investigation," or "questions unrelated to the traffic violation constituted the bulk of the interaction" between the officer and the motorist. Id.

To detain a motorist any longer than is reasonably necessary to issue a traffic citation requires that the officer have a "reasonable suspicion" of criminal activity, and promptly take steps to verify or resolve his suspicions. Crawley, 526 Fed. Appx., at 556-57; Smith, 601 F.3d at

542.

Once a vehicle is lawfully detained, an officer may order the driver to get out of the vehicle. Pennsylvania v. Mimms, 434 U.S. 106, 111 n. 6, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); United States v. Hockenberry, 730 F.3d 645, 658 (6th Cir. 2013). An officer may also order passengers out of a vehicle pending completion of a valid traffic stop. Maryland v. Wilson, 519 U.S. 408, 415, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997); United States v. Ivey, 507 Fed. Appx. 502, 505 (6th Cir. Dec. 4, 2012).

The evidence at the hearing indicates that Deputy Hill stopped the Defendant's vehicle approximately 55 seconds into the video. (Id., at 25). At approximately one minute and 23 seconds into the video, Deputy Hill approached the passenger side of the vehicle, where Co-Defendant Cinthia Collazo, Defendant's wife, was sitting, and began speaking to the occupants. (Id., at 26-27). Deputy Hill testified that he identified himself, and asked the Defendant for his driver's license, registration, and proof of insurance. (Id., at 27). Deputy Hill said that he also asked Ms. Collazo for identification. (Id., at 28). Accordingly to Deputy Hill, Ms. Collazo was very erratic, stretching her arms and back, and moving during the entire stop. (Id., at 27). Deputy Hill testified that he waited while the Defendant attempted to locate the documents he had requested, but at three minutes and 23 seconds into the video, asked the Defendant to step out of the vehicle because it was difficult to hear him with the traffic noise. (Id., at 29-30). While standing at the passenger window, Deputy Hill said, he noticed a jar of urine in the van, which he said indicates "hard travel" – in which the occupants do not want to take the time to stop. (Id., at 29-30). Deputy Hill testified that although he had seen truckers use urine jars, he had not commonly see them in passenger vehicles. (Id., at 30).

9

At approximately three minutes and 35 seconds into the video, Deputy Hill testified, he told the Defendant why he had stopped him, and that he was going to check the Defendant's driver's license, and obtain the citation book. (Id., at 30). Deputy Hill testified that the Defendant was confirming his address at approximately four minutes into the video. (Id., at 31). Forty seconds later, according to Deputy Hill, while completing the citation, he asked the Defendant his destination. (Id.). Deputy Hill testified that the Defendant said he was traveling from Dallas to a Nashville hospital to see his father-in-law, who recently had suffered a stroke. (Id.). When asked which hospital his father-in-law was in, Deputy Hill said, the Defendant answered: "the big one." (Id., at 31-32).

At approximately six to seven minutes into the video, Deputy Hill testified, the Defendant explained to him that he owned a body shop, and had to get back in time to complete payroll by Friday. (Id., at 32). Deputy Hill said they also had a general conversation about the van the Defendant was driving, and that the Defendant was currently raising his nieces and nephews. (Id.)

Deputy Hill testified that at approximately seven minutes and 20 seconds into the video, he asked the Defendant if he could speak with his wife, and the Defendant nodded affirmatively. (Id., at 32-33). Deputy Hill testified that he approached the passenger window, and started speaking with Ms. Collazo. (Id., at 33). According to Deputy Hill, Ms. Collazo was unable to tell him her destination, but when asked if her father had suffered a stroke recently, she said that he had. (Id.) She said that they were traveling to Nashville to see him, but that she did not know where he lived because she thought he had moved since they had come to Nashville the previous month. (Id.) She said she needed to call her sister to find out, according to Deputy Hill. (Id.)

10

Deputy Hill testified that he asked Ms. Collazo whether her father was in the hospital or at home, and she said that he was at home. (Id.). Deputy Hill testified that Ms. Collazo told him she hadn't spoken to her father in a while, and found out about the stroke from her sister. (Id., at 34). When Deputy Hill asked her if she had ever been arrested for drugs or narcotics, Ms. Collazo said that she had been arrested for cocaine. (Id., at 36-37). During the conversation, Deputy Hill testified, Ms. Collazo was difficult to understand, and seemed unable to be still. (Id.). Deputy Hill testified that he believed the inconsistent stories told by the Defendant and his wife, along with Ms. Collazo's behavior, and the urine jar, were indicative of criminal activity. (Id., at 34-35).

At approximately 12 minutes and 56 seconds into the video, Deputy Hill left the passenger window and began talking with the Defendant again. (Id., at 36-37). According to Deputy Hill, he explained to the Defendant that dispatch had not called back with the results of the driver's license check, and asked the Defendant if "he was okay with waiting until they came back," and the Defendant said yes. (Id., at 37).

Deputy Hill testified that he then asked the Defendant what was wrong with his wife, referring to her erratic behavior, and whether she was under the influence of narcotics or anything of that nature. (Id.) According to Deputy Hill, the Defendant said Ms. Collazo had undergone several cosmetic surgeries and could be on pain medication. (Id.). Deputy Hill testified that he asked the Defendant about narcotics based on Ms. Collazo's behavior, the urine bottle, and the Collazos' inconsistent stories. (Id.)

At approximately 13 minutes and 36 seconds into the video, Deputy Hill testified, he called for backup from David Montgomery of the Tennessee Highway Patrol and the West Tennessee Drug Task Force. (Id., at 10, 38). Deputy Hill said he called for backup based on Ms.

11

Collazo's behavior, the urine bottle, and the Collazos' inconsistent stories. (Id., at 38).

Deputy Hill testified that at approximately 15 minutes into the video, he was completing the warning citation. (Id., at 38, 40). At 15 minutes, 46 seconds into the video, Trooper Montgomery arrived on the scene and began talking to the Defendant. (Id., at 38-39). At approximately 17 minutes into the video, Deputy Hill testified, Trooper Montgomery started speaking to Ms. Collazo at the passenger window of the van. (Id., at 39-40). Deputy Hill testified that at 17 minutes and 23 seconds into the video, he was explaining the warning citation to the Defendant, having received a call from his check on warrants and registration, and at approximately 19 minutes into the video, the Defendant started to sign the warning citation. (Id., at 40, 97-98). After the Defendant signed the warning citation, Deputy Hill handed it to the Defendant, and the two shook hands at approximately 21 minutes and 39 seconds into the video. (Id., at 40-42). At that time, Deputy Hill testified, Trooper Montgomery was still at the passenger window speaking with Ms. Collazo. (Id., at 42). Deputy Hill testified that he and the Defendant continued to converse. (Id., at 42-43).

At approximately 29 minutes and 20 seconds into the video, Trooper Montgomery turned from the van with Ms. Collazo's handbag in his hand. (Id., at 43). Deputy Hill testified that he later learned there were Suboxone tongue strips and a prescription bottle that was not in Ms. Collazo's name in Ms. Collazo's purse. (Id., at 43-46).[4] At approximately 33 minutes into the video, Deputy Hill testified, he approached the passenger window of the van to see if Ms. Collazo's behavior had changed, and once there, he asked for Ms. Collazo's consent to search the vehicle. (Id., at 47). According to Deputy Hill, Ms. Collazo consented to the search. (Id., at

---

[4] In later testimony, Deputy Hill admitted that he was not familiar with what was on the prescription bottle. (Id., at 82-84).

12

48).

At approximately 34 minutes into the video, Trooper Montgomery placed handcuffs on the Defendant. (Id., at 48). Deputy Hill testified that he asked the Defendant for consent to search about five seconds later, and the Defendant agreed. (Id., at 48-49). Deputy Hill testified that he did not get written consents from the Collazos. (Id.).

Deputy Hill testified that Ms. Collazo got out of the vehicle at approximately 35 minutes into the video, and continued her erratic behavior. (Id., at 49-50). Deputy Hill testified that he asked Ms. Collazo if she had any weapons, and she said she did not. (Id., at 50).

Deputy Hill testified that the officers began the search after receiving consent to search. (Id., at 49). According to Deputy Hill, his camera stopped recording at approximately one hour and 11 minutes into the video because the memory card was full. (Id., at 51). About 15 to 20 minutes later, according to Deputy Hill, the officers found cocaine in hidden compartments in the vehicle. (Id, at 52).

Trooper Montgomery testified at the hearing that he responded to Deputy Hill's request for backup, and appeared in the video after approximately 15 ½ minutes. (Id., at 124-25). After speaking with the Defendant, Trooper Montgomery testified, he went to the passenger side of the Defendant's vehicle and spoke with Ms. Collazo. (Id., at 125-26). Trooper Montgomery described her as being unable to sit still as if she were under the influence of an intoxicant or stimulant. (Id., at 126). Trooper Montgomery testified that he asked Ms. Collazo if he could talk with her, and she said she did not mind. (Id., at 127). When he asked her where she was going, Trooper Montgomery testified, she said that she was traveling to her father's home in Nashville because he had suffered a stroke, and intended to call her sister for directions to his house when

13

she arrived. (Id., at 127-28). Trooper Montgomery testified that when he asked Ms. Collazo if she was nervous because there was something illegal in the vehicle, she appeared defeated and looked down at her purse. (Id., at 128-29). Trooper Montgomery testified that he then asked her again if there was something illegal, and if so, was it "a little bit, or is it a lot." (Id.) According to Trooper Montgomery, Ms. Collazo answered "it is a lot," and handed him her purse. (Id., at 129). When asked if the illegal substance was in the purse, Trooper Montgomery testified, Ms. Collazo nodded her head affirmatively. (Id.). According to Trooper Montgomery, he asked Ms. Collazo for consent to search her purse, and she agreed. (Id., at 147).

Trooper Montgomery testified that he looked in the purse and found a prescription bottle containing Suboxone strips. (Id.). Trooper Montgomery testified at first that the bottle did not have Ms. Collazo's name on it, but later stated that he could not remember whose name was on the bottle. (Id., at 129, 133, 216-19). A picture of the bottle with Ms. Collazo's name was later entered in the record as Defendant's Exhibit Five, and the parties stipulated that the date on the bottle was August 30, 2013. (Id., at 229-30).

Trooper Montgomery testified that when he asked Ms. Collazo if the Suboxone strips were hers, she said she bought them from a relative for $10 each. (Id.)[5] At that point, Trooper Montgomery testified, Ms. Collazo started crying and became very upset, and he attempted to calm her down before leaving her to speak with Deputy Hill. (Id., at 129-30). Trooper Montgomery turned from the van at approximately 29 minutes and 20 seconds into the video, and approached Deputy Hill carrying a purse in one hand and a pocketbook in the other. (Id., at 130). According to Trooper Montgomery, the Suboxone strips were separated, with some in the

---

[5] Trooper Montgomery could not recall if Ms. Collazo described the relative as a sister-in-law or cousin. (Id., at 129, 215-16, 225).

14

bottle, some in the pocketbook and some in the purse. (Id.)  Trooper Montgomery estimated that he discovered the Suboxone strips within the first three to five minutes of his conversation with Ms. Collazo. (Id., at 132-33, 134).

Trooper Montgomery testified that he then spoke to the Defendant about the Suboxone strips, and the Defendant told him that his wife had undergone several cosmetic surgeries, and he thought she had a prescription for the Suboxone. (Id., 131). At approximately 34 minutes into the video, Trooper Montgomery handcuffed the Defendant. (Id., at 134-35).

Trooper Montgomery testified that at some point after the Defendant was handcuffed, he heard Deputy Hill asked him for consent to search and he heard the Defendant agree. (Id., at 135-36, 146-47).  Officers eventually found 17 kilos of cocaine hidden in various cavities of the van. (Id., at 143-45; Defendant's Exhibit 3).

The Defendant testified at the hearing that after pulling him over, Deputy Hill came to the passenger side window of the van, told him that he had nearly caused an accident, and asked for his registration, driver's license and proof of insurance. (Transcript of Suppression Hearing, Volume II, at 258 (Docket No. 105)).  According to the Defendant, he was unable to find his registration, and after explaining that, Deputy Hill asked him to get out of the van. (Id.)  The Defendant testified that Deputy Hill then told him to wait while he retrieved his ticket book. (Id.)  When he returned, the Defendant testified, Deputy Hill told him he was going to issue a warning for following too closely, but would not issue a ticket. (Id.)

The Defendant testified that Deputy Hill asked him several questions while filling out the warning citation. (Id.)  Deputy Hill asked him where he was going, who was in the car, where he lived, whether he had any children, whether he had tattoos, what type of van he was driving, and

15

where he was working. (Id.) The Defendant testified that Deputy Hill then went to speak with his wife, and when he returned, he said he was checking on the Defendant's registration and warrants. (Id., at 259-60). Deputy Hill told the Defendant it might take a little bit longer because he had to call it in because of the trees, apparently referring to the difficulty with obtaining service to communicate with dispatch. (Id., at 261). According to the Defendant, Deputy Hill did not ask him for permission to speak with his wife; he did not ask for permission to search his vehicle; and he did not ask him to sign a waiver of rights. (Id., at 260, 271-72).

The Defendant testified that Deputy Hill handed him the ticket at approximately 20 minutes and 20 seconds into the video, after explaining that everything came back clean and after having the Defendant sign the ticket. (Id., at 262). Approximately nine minutes later, the Defendant testified, Trooper Montgomery ended his conversation with Ms. Collazo and approached the Defendant holding her bag. (Id.)

According to the Defendant, Trooper Montgomery then asked him why the Suboxone prescription bottle was empty, and the Defendant told him to look in the bag. (Id.) The Defendant testified that Trooper Montgomery knew the prescription was for Ms. Collazo, and knew the date on the bottle. (Id., at 263-64). The Defendant testified that Trooper Montgomery found the Suboxone strips in the bag. (Id.) The Defendant identified Ms. Collazo's prescription for the Suboxone strips, introduced as Defendant's Exhibit 7 at the hearing. (Id., at 265-66, 269). According to the Defendant, the prescription was for 15 strips, to last for two months, and was filled on August 30, 2013. (Id.)

The Defendant testified that after the officers counted the money they found on the Collazo's, Trooper Montgomery discovered an envelope with a white substance in it that he

16

thought was cocaine. (Id., at 267). At that point, according to the Defendant, Trooper Montgomery put handcuffs on him. (Id.) The Defendant testified that he told Trooper Montgomery the substance was not cocaine, but rather was a powder sold in certain Latino stores for good luck. (Id., at 267-71). The Defendant testified that Deputy Hill told him he could have his canine walk around the van, and if he failed to alert, the Defendant would be able to leave. (Id., at 270-71). Despite making this statement, the Defendant testified, Deputy Hill did not use his canine during the entirety of the stop. (Id., at 271).

The Defendant testified that neither he nor his wife were asked for consent to search and neither of them gave consent. (Id., at 260, 271, 275).

Bryon Osborne of the U.S. Marshal Service testified at the hearing that during the intake process for Ms. Collazo on October 17, 2013, she told him that she was addicted to Suboxone, and had last used the drug on the day of the traffic stop. (Id., at 317-18).

Based on the evidence adduced at the suppression hearing, the Court concludes that the totality of the circumstances surrounding the stop indicate that it was reasonable and not unlawfully prolonged. The evidence indicates that it took Deputy Hill approximately 21 minutes to complete the warrants and registration check and to issue the citation to the Defendant, which was not an unreasonable amount of time to complete that process. The questions asked by Deputy Hill during that time were primarily related to the Defendant's operation of the vehicle and travel plans. Other questions asked by Deputy Hill during that time were supported by reasonable suspicion based on the inconsistent stories told by the Defendant and his wife, as well as Ms. Collazo's erratic behavior.

The evidence at the hearing further indicates and the Court finds that any detention of the

Defendant after Deputy Hill handed him the traffic citation was justified by statements Ms. Collazo had made to Trooper Montgomery. Trooper Montgomery testified that within three to five minutes after he began his conversation with Ms. Collazo, which was before or contemporaneous with Defendant's signing of the citation, Ms. Collazo told him, after a consensual search of her purse revealed Suboxone strips, that she had purchased the Suboxone from a relative. That admission by Ms. Collazo, along with the inconsistent, improbable stories given by the Collazos and the erratic behavior of Ms. Collazo, gave the officers probable cause to search the vehicle. See United States v. Ross, 300 Fed. Appx. 386, 390 (6th Cir. Nov. 12, 2008).

The Defendant argues that the presence of Ms. Collazo's name on the prescription bottle fully explained the presence of Suboxone strips in her purse, and defeats probable cause. The uncontroverted proof indicates, however, that Ms. Collazo stated she obtained the strips she possessed from a relative rather than through the prescription given by her physician. That the dosage instructions and the quantity set forth on the prescription bottle indicated that those Suboxone strips would have been consumed by the date of the stop lent credence to Ms. Collazo's statement that she obtained the strips in her purse from a relative.[6]

Having found probable cause to support the search, the Court finds it unnecessary to consider the Government's argument that the Defendant consented to a search of the vehicle.

---

[6] The dosage instructions on the prescription bottle stated: "Dissolve ½ film under the tongue every day," and the quantity listed on the bottle was 15. Defendant's Exhibit 5. The date on the bottle was August 30, 2013. (Docket No. 105, at 56). Thus, it was reasonable for the officer to assume that the strips issued pursuant to the prescription would have been consumed by September 30, 2013, and therefore, the 14 strips he found in Ms. Collazo's purse on October 9, 2013, were obtained without a valid prescription as she had indicated.

C. Miranda Warnings

The Defendant argues that any consent to search he allegedly provided was invalid because he had not been advised of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) before he allegedly gave consent. As the Court has not relied on consent as a basis for the search of the vehicle, it is unnecessary to address the parties' Miranda arguments. To the extent the Defendant seeks to suppress other alleged statements based on Miranda, he should file an appropriate motion and the Court will consider his arguments.

D. Cell Phone Search

The Defendant argues that the images obtained from his cell phone without a warrant and without his consent should be suppressed, citing Riley v. California, 134 S.Ct. 2473 (2014). In Riley, the Supreme Court held that police conducting a search incident to an arrest could not search an arrestee's cell phone absent a search warrant authorizing them to do so.

The Government has not filed a search warrant authorizing the search of the Defendant's phone, nor has it otherwise addressed the Defendant's argument. Accordingly, the Defendant's Motion is GRANTED as to evidence obtained from his cell phone.

IV. Conclusion

For the reasons set forth herein, the Defendant's Motion To Suppress (Docket No. 53) is granted in part, and denied in part.

It is so ORDERED.

_____
TODD J. CAMPBELL
UNITED STATES DISTRICT JUDGE